THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Mailed:
August 9, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Nike, Inc.
v.
Peter Maher and Patricia Hoyt Maher

_____

Opposition No. 91188789
to application Serial No. 77539642
filed on 8/5/2008

_____

Michelle L. Calkins of Leydig, Voit & Mayer, Ltd. for Nike, Inc.

Peter Maher and Patricia Hoyt Maher, pro se.

_____

Before Walters, Bergsman and Wolfson, Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

Applicants, Peter Maher and Patricia Hoyt Maher, filed a trademark application for the mark JUST JESU IT for the following clothing items:

> athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, athletic uniforms; bermuda shorts; board shorts; boxer shorts; button-front aloha shirts; fleece shorts; golf shirts; gym shorts; hat bands; hats; hooded sweat shirts; knit shirts; long-sleeved shirts; night shirts; open-necked shirts; panties, shorts and

briefs; pique shirts; polo shirts; rugby shirts; rugby shorts; shirts; short sets; short trousers; short-sleeved or long-sleeved t-shirts; short-sleeved shirts; shorts; sleep shirts; sport shirts; sports shirts with short sleeves; sweat shirts; sweat shorts; t-shirts; tee shirts; toboggan hats, pants and caps; underwear, namely, boy shorts; walking shorts; wearable garments and clothing, namely, shirts; woolly hats.

Nike, Inc. ("opposer") has filed an opposition against applicants' application, alleging prior use and ownership of the following registrations of the mark JUST DO IT, in typed drawing form:

1. Reg. No. 1875307 for "clothing, namely t-shirts, sweatshirts and caps"; registered January 24, 1995; renewed.

2. Reg. No. 1817919 for "paper goods and printed matter; namely, bumper stickers, note pads, posters and banners; non-metallic key chains and ornamental novelty buttons; mugs"; registered January 25, 1994; renewed.

3. Reg. No. 1931937 for "binders, student planners, portfolio covers"; registered October 31, 1995; renewed.

Opposer further alleges that applicants' mark JUST JESU IT so closely resembles opposer's mark that confusion is likely under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).[1] In addition, opposer alleges that its mark is famous; that the mark became famous prior to the filing date

---

[1] Opposer alleges use of the mark JUST DO IT both with and without a final period ("."). With the exception of Reg. No. 1931937, its pleaded registrations include the final period. For ease of reference, the form of the mark we use herein is without the final period.

of the application; and that applicants' mark is likely to dilute the distinctiveness of opposer's famous mark under Section 43(c), 15 U.S.C. § 1125(c), by lessening the capacity of the mark to identify and distinguish opposer's goods and services. Applicants generally denied each of the salient allegations in the complaint. After trial, both sides filed trial briefs and opposer filed a reply brief.

## The Record

By rule, the record includes applicants' application file and the pleadings. Trademark Rule 2.122(b), 37 CFR §2.122(b).

### I. Opposer's Evidence

Opposer introduced the following testimony of its employees and the following evidence during its testimony period:

1. The testimony deposition of Jaime Schwartz, Assistant General Counsel, with attached exhibits Nos. 1-11.

2. The testimony deposition of Melanie Sedler, Trademark Paralegal, with attached exhibits Nos. 12-27.

3. The testimony deposition of Jessica Shell, Trademark Paralegal, with attached exhibits Nos. 28-32.

4. The testimony deposition of Mark Thomashow, Global Director, Business Affairs.

Opposer also filed notices of reliance on certified copies of its pleaded registrations prepared by the USPTO showing the current status of and title to the

registrations; applicants' answers to opposer's first set of interrogatories, requests for admissions, and requests for production of documents and things;[2] and newspaper and other periodical articles divided by year, starting with 1989 and continuing through 2010, purporting to show the fame of opposer's mark.

II. Applicants' Evidence

During their testimony period, applicants filed a notice of reliance on certified copies of five third-party registrations showing the current status of and title to the registrations.  Applicants did not introduce any testimony.

## Evidentiary Objections

Opposer objected to the introduction of one of the third-party registrations introduced by applicants on grounds that it has been cancelled.[3]

While a cancelled registration "does not provide constructive notice of anything," *Action Temporary Services*

---

[2] Opposer also attached copies of documents applicants submitted in response to opposer's request for production of documents and things.  Such documents cannot be submitted by notice of reliance alone except to the extent that they are admissible under the provisions of § 2.122(e).  37 C.F.R. § 2.120(j)(3)(ii).  None of the documents submitted by opposer in connection with applicants' answers to the document production request are admissible under this rule, and accordingly they have not been considered. However, applicants' responses, in connection with several of the requests, that no such documents exist, have been treated as being of record.  *See L.C. Licensing Inc. v. Berman,* 86 USPQ2d 1883 n.5 (TTAB 2008); TBMP § 704.11 (3d ed. 2011).

[3] Reg. No. 2980221.

*Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989), it is admissible under 37 C.F.R. § 2.122(e) as an official record. In addition, third-party registrations may be used to indicate that a commonly registered element has a suggestive meaning. *Spoons Restaurants Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1740 (TTAB 1991), *aff'd unpub'd,* No. 92-1086 (Fed. Cir. June 5, 1992). To the extent the registrations, including the cancelled registration, have been offered for the purpose of showing the suggestive nature of any commonly registered element, we have considered them for whatever probative value they may have.[4]

## Standing and Priority

Because opposer has properly made of record certified copies of its pleaded registrations, opposer has established its standing. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). Moreover, priority of use for Section 2(d) purposes is not an issue in this proceeding. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

---

[4] To the extent the cancelled registration has any evidentiary value, it is limited to the short time that the mark was registered; i.e., from July 26, 2005 to April 5, 2006.

In addition, the evidence establishes opposer's use of its registered mark from at least as early as 1989,[5] which predates the earliest date upon which applicants may rely (August 5, 2008, the filing date of their application), as applicants have not yet commenced actual use of their mark.[6]

## Likelihood of Confusion

Opposer contends that applicants' mark is likely to cause confusion among consumers under Trademark Act § 2(d), 15 U.S.C. § 1052(d). Our determination as to whether there is a likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In this case, the facts in evidence bear on the following factors: fame of opposer's mark, the similarity between the marks, the identity of the goods and relatedness of trade channels, and the classes of purchasers.

---

[5] Thomashow Dec., pp. 14-15.
[6] Applicants' Brief, p. 1; Opposer's Second Notice of Reliance, Ex. 4.

## I. Fame of Opposer's Mark

Applicants have admitted that opposer's mark is famous for likelihood of confusion purposes.[7] *Lacoste Alligator S.A. v. Maxoly Inc.*, 91 USPQ2d 1594, 1597 (TTAB 2009)(admission that plaintiff's mark is famous sufficient for likelihood of confusion purposes). Moreover, we have found opposer's mark famous for dilution purposes. *See discussion infra.* In view of the foregoing, we find that opposer's mark is famous for likelihood of confusion purposes. *See Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005); *Cf. Coach Services Inc. v. Triumph Learning LLC*, 96 USPQ2d 1600, 1610 (TTAB 2010) ("Fame for dilution requires a more stringent showing.").

This factor strongly favors opposer.

## II. The Similarity or Dissimilarity and Nature of the Goods; The Similarity or Dissimilarity of Likely-To-Continue Trade Channels and Classes of Consumers.

Applicants have applied to register their mark for various articles of clothing, including "hats and caps," "hooded sweat shirts," "short-sleeved or long-sleeved t-shirts," and "sweat shirts." Opposer's Reg. No. 1875307 covers "t-shirts," "sweatshirts," and "caps." The goods are

---

[7] *Opposer's Second Notice of Reliance,* Exhibit 2: Request for Admissions, No. 4 seeks an admission that "Opposer's mark "JUST DO IT" is famous." Response: "Admit."

identical in part. Moreover, both applicants' and opposer's clothing are broadly identified without any restrictions or limitations as to the type of clothing (with the exception that applicants' description of t-shirts excludes sleeveless t-shirts), channels of trade or classes of consumers. Therefore, we must assume that both applicants' and opposer's clothing encompass all types of shirts, caps, t-shirts (except sleeveless) and sweat shirts, and that they are sold in the same channels of trade and to the same classes of consumers. *See Genesco Inc. v. Martz,* 66 USPQ2d 1260 (TTAB 2003); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers.").

This factor favors opposer.

## III.  Similarity of the Marks

We now consider the similarity of the marks, comparing the marks in their entireties as to appearance, sound, connotation and commercial impression in order to determine the similarity or dissimilarity between them. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). Because opposer's mark is famous, it enjoys a wide latitude of protection, and the degree of similarity between the

marks necessary to support a conclusion of likely confusion declines. *Bose Corp. v. QSC Audio Products Inc*., 63 USPQ2d 1303, 1305 (Fed. Cir. 2002). The degree of similarity required is also lessened in this case because the goods are identical in part. *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992); *Schering-Plough HealthCare Products Inc. v. Ing-Jing Huang,* 84 USPQ2d 1323, 1325 (TTAB 2007); *Jansen Enterprises Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007).

With these principles in mind, we consider the marks, not as they would compare if subjected to a side-by-side comparison, but rather in terms of whether the marks are sufficiently similar in their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result. *See San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1,3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd unpub'd,* No. 92-1086 (Fed. Cir. June 5, 1992).

We find that the marks are similar in their overall appearance. Both applicants' and opposer's marks start and end with the same words "just" and "it." Both are only three words long. This gives the marks a similar look. As

to pronunciation, the second term in applicants' mark ends in the vowel "u," as does the middle word in opposer's mark: "do," and both marks start and end with the same word, thus the same sounds: JUST and IT.  Applicants' mark may be pronounced "Just Jesuit," varying only slightly the cadence of opposer's mark.  In meaning, opposer has shown that its mark has been viewed as a "battle cry."[8]  The meaning of applicants' mark is ambiguous, not just as a three-term phrase with a middle term that evokes "Jesus" (but appears not to be itself an English word), but even when that middle term "Jesu" is combined with "it" to form the word "Jesuit." Despite this ambiguity in the meaning of applicants' mark, the overall commercial impression of the parties' marks is similar because given the fame of opposer's mark, the public is likely to view applicants' mark as similarly being a call to action, even though it is unclear what action is being urged.  "[A] purchaser is less likely to *perceive* differences from a famous mark."  *B.V.D. Licensing v. Body Action Design,* 846 F.2d 727, 730, 6 USPQ2d 1719, 1722 (Fed. Cir. 1988)(Nies, J., dissenting)(emphasis in original), and quoted with approval in *Kenner Parker Toys Inc. v. Rose Arts*

---

[8] *See, e.g.,* Nicholas, Jonathan, *Dump Dan? Nike Nearly Just Did It, supra,* "[Nike's] slogan, 'Just Do It,' has become the world's best-known battle cry."

*Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Thus, despite the potential differences in meaning, given the fame of opposer's mark and the similarity of appearance, pronunciation and overall commercial impressions, we find the marks to be similar for likelihood of confusion purposes.

Applicants argue that the marks are dissimilar in appearance because their mark is to be used in conjunction with a "crown of thorns." This argument is unavailing. The issue of likelihood of confusion must be decided based upon a comparison of applicants' mark as set forth in the application and the cited registrations, and not upon a comparison of applicants' mark as it may appear on the goods. *See Ultracashmere House Ltd. v. Springs Mills Inc.,* 4 USPQ2d 1252, 1254 (Fed. Cir. 1987).

To the extent applicants argue that their mark is a protected parody, we note that parody is not a defense if the marks would otherwise be considered confusingly similar. *See, e.g., Starbucks U.S. Brands, LLC and Starbucks Corporation D.B.A. Starbucks Coffee Company v. Marshall S. Ruben*, 78 USPQ2d 1741, 1754 (TTAB 2006); *Columbia Pictures Industries, Inc. v. Miller,* 211 USPQ 816, 820 (TTAB 1981) ("The right of the public to use words in the English

11

language in a humorous and parodic manner does not extend to use of such words as trademarks if such use conflicts with the prior use and/or registration of the substantially same mark by another.").

In this regard, we do not see, nor do applicants explain, how JUST JESU IT parodies JUST DO IT. Thus, where, as here, a defendant appropriates a trademarked symbol such as a word or picture, not to parody the product or company symbolized by the trademark, but only as a prominent means to promote, satirize or poke fun at religion or religious themes,[9] this is not "parody" of a trademark. *See Elvis Presley Enterprises Inc. v. Capece,* 141 F.3d 188, 46 USPQ2d 1737, 1745-46 (5th Cir. 1998); *Dr. Seuss Enterprises L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 42 USPQ2d 1184 (9th Cir. 1977).

This factor weighs in opposer's favor.

## IV. Balancing the factors

Opposer's famous mark, JUST DO IT, is entitled to a wide scope of protection. *See, e.g., Bose Corp. v. QSC Audio Prod.'s Inc.,* 63 USPQ2d 1303, 1309 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 54 USPQ2d 1894, 1897 (Fed. Cir. 2000)("Famous marks are accorded more protection precisely

---

[9] Applicants state their intent is to sell "humorous Jesus-themed t-shirts and sweatshirts and other apparel…." *Applicants' Brief,* p. 1.

because they are more likely to be remembered and associated in the public mind than a weaker mark.")  The goods involved are identical in part and are presumed to travel through the same trade channels and be purchased by the same classes of consumers.  The marks are similar in their entireties, giving due weight to their appearances, sound, meaning and commercial impressions.  In view of the foregoing, we find that applicants' mark JUST JESU IT is likely to cause confusion with opposer's mark JUST DO IT.

Although we have found sufficient basis for refusing registration to applicants on this ground, for the sake of completeness, we proceed to consider opposer's dilution claim, including consideration of opposer's claim that its mark JUST DO IT is not merely famous for our likelihood of confusion analysis but also sufficiently famous to warrant protection from dilution.

## Dilution by Blurring

Opposer contends that applicants' mark will dilute opposer's famous JUST DO IT mark under the Trademark Dilution Revision Act of 2006 ("TDRA"), Trademark Act § 43(c), 15 U.S.C. § 1125(c), by blurring its distinctiveness. Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15

13

U.S.C. §1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," 15 U.S.C. §1125(c)(1).

"When an application to register a mark is challenged on grounds of dilution [by blurring], we look to three elements: (1) whether the opposer's mark is famous; (2) whether the opposer's mark became famous prior to the date of the application to register the applicant's mark; and (3) whether the applicant's mark is likely to blur the distinctiveness of the opposer's famous mark." *National Pork Board v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1494-5 (TTAB 2010).

I. Fame of Opposer's JUST DO IT Mark

We first turn to the factor of fame. A mark is defined under §1125(c)(2)(A) as "famous" for dilution purposes -

> … if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> > (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

As noted *supra,* applicants have admitted that opposer's mark is famous for likelihood of confusion purposes.[10] Even under the "higher and more rigorous standard for dilution fame required under the FTDA [Federal Trademark Dilution Act]," *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005), applicants have admitted the fame of opposer's mark. Applicants answered opposer's interrogatory No. 13 regarding applicants' awareness of the mark JUST DO IT with the response: "Who isn't aware of Opposer's Mark? At least in the free world." Applicants also answered opposer's request for production of documents regarding when applicants first learned of opposer's mark with the response: "No such documents. Applicants don't live under a rock."[11]

---

[10] *Opposer's Second Notice of Reliance,* Exhibit 2: Request for Admissions, No. 4 seeks an admission that "Opposer's mark "JUST DO IT" is famous." Response: "Admit."
[11] Opposer's Request for Production of Documents, No. 20.

We not only find applicants' admission compelling, but we also find that under the criteria set forth in the Act, opposer has shown that its mark is famous for dilution purposes.  We examine these elements in turn.

A.  Extent of Actual Recognition

Perhaps the most significant of the four elements set forth in the Act to determine fame is the extent of actual public recognition of the mark as a source-indicator for the goods or services in connection with which it is used. Here, third-party references to and discussions about the mark JUST DO IT have been pervasive, reflecting the extreme popularity of the mark and the message of compelled action that it represents.[12]  The slogan has made its way into the popular culture at all levels, as evidenced by the following articles:

> Where a procrastinator might once have been advised, "A stitch in time saves nine," now, a young dawdler could be moved by the Nike commercial tag line: "Just do it."

Williams, Lena, *For Advice, the Media as Mom,* The New York Times, August 2, 1989.

> The most visible thing about Nike is its marketing, not its matrix.  The company's "Just Do It" advertising slogan is one of those rare gems that have transcended advertising to enter popular culture and language.

---

[12] The probative value of the news articles is that they show how the authors perceive, or refer to, opposer's mark, and the exposure of the public to the mark.

Cox, James, *Shoes with an Attitude,* USA Today, August 2, 1990.

> There are other cultural trends moving in Perot's direction.  At a time when Nike's "Just do it" is the advertising slogan of the age, Perot embodies that desire in a multitude of ways.

Stark, Steven, *Why Perot? No-Nonsense, Can-Do Savior,* Orlando Sentinel, June 9, 1992.

> The vital difference between Warhol and advertising is that advertising, because it has to sell things, is, in the end, never ironic.  The deadpan image of an athletic shoe, combined with a simple declarative Nike slogan like "Just Do It" became a cultural phenomenon….

Lewis, Jo Ann, *It's Postmodern; and if you don't get it, you don't get it,* The Washington Post, March 27, 1994.

> Nike dominates the U.S. athletic shoe industry, testimony to a marketing machine so successful that the company's "Just Do It" slogan and "swoosh" logo are part of U.S. pop culture.

Bloomberg Business News, *Nike Just Does What Customers Want,* Plain Dealer (Cleveland, Ohio), January 6, 1996.

> Wieden is the soft-spoken boss who brings a Zen like calm to the breakneck business of leading the world's hottest advertising agency.  He has helped Nike become the world's most recognizable brand.  Its slogan, "Just Do It," has become the world's best-known battle cry."

Nicholas, Jonathan, *Dump Dan? Nike Nearly Just Did It,* The Sunday Oregonian, November 30, 1997.

> Wieden & Kennedy crafted one memorable ad after another for Nike, including one of the most enduring slogans in advertising history: "Just Do It."

Sanders, Holly M., *Nike Drops an Old Shoe – Longtime Ad Firm Just Won't Do It,* The New York Post, March 14, 2007.

17

> No slogan encapsulated the spirit of 20th century America better, perhaps, than Nike's "Just Do It."

Editorial, *He Just Did it; Inventiveness put Nike's Co-founder on the Fast Track,* Pittsburgh Post-Gazette, December 29, 1999.

> Anyone who watches television learns to identify products by their logos or advertising slogans. We don't need visuals to know that "Just do it!" is associated with Nike,….

Rogers, Rick, *Cruise in Comfort on Norwegian Ship,* Daily Oklahoman, October 1, 2000.

> The recent rash of artists-in-ads represents a new era in the ongoing evolution of the advertising industry into a paragon of chic. … The trend began in the 1980s, with a handful of stylish ads, such as Apple's "1984," and accelerated in the 1990s, with slogans such as Nike's "Just Do It" becoming centerpieces of pop culture.

Schoenberg, Nar, *Trade Chic: Top stars join seller's market; they're perfectly willing to plug products,* The San Diego Union-Tribune, May 26, 2002.

> Nike's ad campaigns, such as "Just Do It," are icons of pop culture.

McCarthy, Michael, *Wake up consumers? Nike's brash CEO dares to just do it,* USA Today, June 16, 2003.

> It's been 20 years since Portland ad man Dan Wieden came up with the phrase "Do It," attached "Just" to the front and pitched the tagline to lukewarm reception from Nike executives on the losing side of a shoe war with Reebok. Today, the eight-letter phrase is among the two or three slogans rated most memorable in advertising history, and Nike is the world's largest sporting goods maker.

Hunsberger, Brent, *"Just Do It" tagline still gets it done,* The Oregonian, July 18, 2008.

18

In addition to articles touting opposer's success with the mark JUST DO IT, opposer identified several independent sources, described below, that identify the slogan as among the most well known in the country, suggesting that, at the very least, most consumers are familiar with the slogan.

In 1995, The Wirthlin Group, for the Association of National Advertisers, "asked a representative sample of 1,002 people to recall, without any prompting, slogans and celebrity endorsers. … The top slogans were Wendy's (Where's the Beef?), followed by Alka-Seltzer (Plop, plop, fizz, fizz …) and Nike (Just do It)…."[13]

In 1999, an "Historic Events and Pop Culture Survey," conducted by Colonial Williamsburg, an entity independent from opposer, found that 79% of respondents correctly identified opposer as the source of the "advertising slogan 'Just Do It.'"  *See NASDAQ Stock Market Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718, 1737 (TTAB 1998)(75% recognition among investors sufficient for finding of dilution).

Also in 1999, Advertising Age magazine came out with a "special edition marking 100 years of the ad business," ranking JUST DO IT "No. 2 in its survey of the most

---

[13] Casteaneda, Laura, *Catchy Slogans Can Turn Splash into Cash,* The Dallas Morning News, August 21, 1995; Opposer's Third Notice of Reliance, Ex. 7.

memorable slogans of the 20th Century – behind De Beers' 'Diamonds are forever.'"[14]

And in 2008, Inc.com named the mark JUST DO IT one of "The 10 Best Slogans of All Time."[15]

The mark's popularity resonates over a broad spectrum of the public. Kids wear JUST DO IT t-shirts.[16] A screen shot from a Cleveland Cavaliers basketball fan site showing basketball player LeBron James includes the following quote: "The pre-game ritual of LeBron has become a symbol of the ultimate JUST DO IT moment."[17] Books have been written about the value of the mark to opposer.[18]

---

[14] Hunsberger, Brent, *Nike's Seen Success From 'Just Do It' for 20 Years; Famous Slogan helped the Athletic Wear Company Surpass its Rivals,* The Post-Standard, July 27, 2008; Opposer's Third Notice of Reliance, Ex. 20.

[15] Shell Dep., p. 20; Ex. 28. "This is a screen shot taken from Inc.com … that was pulled from the Internet in February of 2009 and it lists JUST DO IT as one of the top slogans, top ten slogans of all time."

[16] Thomashow Dep., p. 24. "It's been my theory for a long time that when you do an ad, one way to show how effective the ad is [is] whether kids want a piece of it. [T]he fact that a kid will spend 20 bucks to buy a T-shirt that has Michael and Bugs on it is significant. … People are buying that slogan because they want a piece of Nike's marketing is the best way to say it."

[17] Shell Dep., p. 21. "It's just an example of – says iconic nature of JUST DO IT as it's been rendered in advertising including recent advertising."

[18] Robert Goldman & Stephen Papson, *Nike Culture*, p. 19 (1998); and Donald Katz, *JUST DO IT: The Nike Spirit in the Corporate World* (1994); Exs. 29-30. (Ms. Shell testified that "in this profile of Nike as a business, this author chose to use JUST DO IT as the title" and that the cover included "a very familiar print ad similar to some of the original print ads from the campaign." Shell Dep., p 23.)

There is widespread and extensive third-party recognition of the mark.

### B.  Advertising and Publicity of the Mark

Over its 20-plus year lifespan, opposer has spent approximately $6 billion in advertising the mark JUST DO IT.[19]  Opposer has advertised in network and cable television commercials and print advertising, including having produced several award-winning ads, throughout the United States.[20] Its print advertising has run in Elle, Runners World, Sports Illustrated, Redbook, Esquire, Rolling Stone, Entertainment Weekly, People and Time.[21]  Opposer's advertising uses well-known sports figures, such as Michael Jordan, John McEnroe, Bo Jackson, Tiger Woods and LeBron James.[22]  Several of opposer's television commercials have been "put out on the Internet."[23]  The "Just Do It – 'Bo Knows' Campaign" has been viewed on YouTube in excess of 200,000 times.[24]  A 2009 ad campaign titled "Chalk Throw – Lebron Commercials" was made into a video that has garnered over 840,000 views on YouTube.[25]  And a television commercial featuring track and field athlete Carl Lewis that was aired during the 2008

---

[19] Sedler Dep., p. 44; Ex. 25.
[20] Id., p. 42.
[21] Id., p. 42; Exs. 20-24.
[22] Sedler Dep., pp. 39-42; Exs. 23 and 24.
[23] Id., p. 40; Ex. 23.
[24] Id., p. 40.
[25] Id., p. 41; Ex. 23.

Olympics was watched, as of February 2009, over 1.2 million times on YouTube.[26]

Opposer's advertising campaign has been extensive and widespread.

C. Sales of Shoes

In 2006, opposer started placing the JUST DO IT trademark on the bottom of its corporate shoe boxes.[27] Opposer distributes approximately 180 million shoe boxes in a year and its use of the mark on shoe boxes has continued through the present:

> Q. And then if we extended that math through 2010 we would wind up over the past five years at 900 million shoe boxes. Correct?
>
> A. Correct.[28]

D. Sales of Apparel and other Items

Since 1989, opposer has sold over 27 million units of products, including t-shirts, that either bear the JUST DO IT mark or include the mark (or "JDI") "in the style name" of the product.[29] Opposer sold over 10,000 such products, primarily clothing items, but also including backpacks,

---

[26] Id., p. 43.
[27] Id., p. 46.
[28] Id., p. 47.
[29] Schwartz Dep., pp. 12-16; Exs. 4-5. The deposition does not clearly explain the reference to products that include the mark "in the style name."

bags, bumper stickers, totes, and gymsacks.[30] Net sales for those products at the retail level approximate $175 million.[31]

Sales of products bearing the JUST DO IT mark have occurred in every state in the United States.[32]

E. Registration of Opposer's Mark.

The record reflects that opposer owns three registrations for the mark JUST DO IT. These are: Registration No. 1817919, registered in 1994; Registration No. 1875307, registered in 1995; and Registration No. 1931937, registered in 1995. The evidence of record shows that the mark has been registered, in each of the above registrations, on the Principal Register as an inherently distinctive mark without resort to Section 2(f) or subject to a disclaimer of any elements of the mark. Moreover, as the registrations are each over five years old, they are incontestable and not subject to challenge under Trademark Act § 2(e). Trademark Act § 14(3), 15 U.S.C. § 1064(3). This factor favors opposer.

Based on an analysis of the above factors, we find that opposer's JUST DO IT mark is famous for dilution purposes.

---

[30] Id., pp. 12-13; Ex. 4.
[31] Id., p. 15; Ex 5.
[32] Schwartz Dep., p. 16.

## II.  When Did the Mark Become Famous?

Having found opposer's mark to be famous, we must now determine whether that fame attached to the mark prior to any date upon which applicants may rely.  Because applicants have not started using their mark, the earliest date upon which they may rely is August 5, 2008, the filing date of their intent-to-use based application.  *See Citigroup Inc. v. Capital City Bank Group Inc.*, 94 USPQ2d 1645, 1650, fn. 13 (TTAB 2010), *aff'd Citigroup Inc. v. Capital City Bank Group Inc.,* 98 USPQ2d 1253 (Fed. Cir. 2011) (Intent-to-use applicant asserting any use prior to its filing date is required to plead such use as an affirmative defense to dilution claim).

Opposer has established that it has been continuously using its mark since it was introduced in 1989 and that the mark became famous well before August 5, 2008.  *See for example,* various articles published long prior to applicants' filing date, including:  Cox, James, *Shoes with an Attitude,* USA Today, August 2, 1990, ("The company's 'Just Do It' advertising slogan is one of those rare gems that have transcended advertising to enter popular culture and language"); Lewis, Jo Ann, *It's Postmodern; and if you don't get it, you don't get it,"* The Washington Post, March 27, 1994, ("a simple declarative Nike slogan like 'Just Do

24

It' became a cultural phenomenon…."); Bloomberg Business News, *Nike Just Does What Customers Want,* Plain Dealer (Cleveland, Ohio), January 6, 1996, ("the company's 'Just Do It' slogan and 'swoosh' logo are part of U.S. pop culture.").

III.  *Likelihood of Dilution by Blurring*

We now address the question of whether there is a likelihood of dilution by blurring, that is, whether the association arising from the similarity of the parties' marks impairs the distinctiveness of opposer's famous mark under Trademark Act §43(c)(2)(B), 15 U.S.C. § 1125(c)(2)(B).  We must determine not only whether there is an "association" arising from the similarity of the marks, but whether such association is likely to "impair" the distinctiveness of the famous mark.

To do this, we look to the "relevant factors" test provided by Section 43(c)(2)(B):

> In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:
>
> (i)   The degree of similarity between the mark or trade name and the famous mark.
> (ii)  The degree of inherent or acquired distinctiveness of the famous mark.
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

25

> > (iv) The degree of recognition of the famous mark.
> > (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
> > (vi) Any actual association between the mark or trade name and the famous mark.

A.  The Degree of Recognition of Opposer's Mark

As has been discussed, the record shows that the mark JUST DO IT is one of the most famous advertising slogans created, and has been communicated "to wide demographic segments, across gender, age and lifestyle categories."[33] The unaided surveys and other unsolicited media highlight the broad spectrum of public recognition the mark enjoys, and has enjoyed virtually from its inception.  Opposer's continued long use and promotion of the brand have created an extremely well-recognized mark.

B.  The Extent to Which Opposer is Engaging in Substantially Exclusive Use of the Mark.

Opposer has shown that it vigilantly enforces its rights to the mark JUST DO IT.  In addition, while opposer's business affairs department receives an "endless stream of people"[34] requesting to use the mark JUST DO IT, opposer denies all requests for permission to use the mark without regard to the underlying purpose to which the request

---

[33] *Opposer's Brief,* p. 9.
[34] Thomashow Dep., p. 27.

pertains,[35] including requests for permission to use the mark in connection with religious activities.[36]

Applicants, however, have introduced certified status and title copies of four active (and one cancelled) registrations for "JUST … IT" marks, which have been registered for clothing, arguing that inasmuch as the U.S. Patent and Trademark Office has permitted these registrations to co-exist, there can be no valid basis for denying applicants a registration.  We disagree.

Third-party registrations have little probative value by themselves because they tell us nothing about whether or not the marks are actually being used or the manner of any such use.  *Coach Services Inc. v. Triumph Learning LLC*, 96 USPQ2d 1600, 1614 (TTAB 2010); *see also  Smith Bros. Mfg. Co. v. Stone Mfg. Co.,* 476 F.2d 1004, 177 USPQ 462, 463 (CCPA 1973) (the purchasing public is not aware of registrations reposing in the U.S. Patent and Trademark Office); *In re Hub Distributing, Inc.,* 218 USPQ 284, 285 (TTAB 1983). Applicants have not submitted evidence or testimony to prove that the third-party marks are in use.  Without evidence as to how, or whether, the third-party marks have been used, we

---

[35] Id., p. 28.
[36] Schwartz Dep., p. 19, Ex. 6.

cannot assess whether any such use has been so widespread as to have had an impact on consumer perceptions.

To the extent the registrations have been offered not to establish use but to indicate that the phrase is a commonly registered expression having a suggestive meaning, we have considered the registrations for this purpose.  In this regard, the existence of the four active registrations does not persuade us that the phrase "just … it" would be considered a commonly registered element such that a mark following this pattern but with a different middle term would thereby be rendered, as a whole, distinguishable from opposer's famous mark.  See *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1740 (TTAB 1991), *aff'd unpub'd*, No. 92-1086 (Fed. Cir. June 5, 1992).

This dilution factor favors opposer.

C.  The Degree of Inherent or Acquired Distinctiveness of Opposer's Mark

As has been shown, opposer's mark has attracted widespread recognition and success as an indicator of source of opposer's goods.  While the phrase "just do it" may have the suggestive connotation of compelled action, it does not appear to have any specific meaning in relation to opposer's goods.  The mark is registered on the Principal Register without resort to a claim of acquired distinctiveness under

Section 2(f).  In addition, there are no other uses of the phrase by third parties revealed by the record.  Opposer has established that its mark is "so distinctive that the public would associate the term with the owner of the famous mark even when it encounters the term apart from the owner's goods or services."  *Nasdaq,* 69 USPQ2d at 1735, *citing Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1177 (TTAB 2001).

This factor favors opposer.

D.  The Degree of Similarity between the Marks

Under the Federal Trademark Dilution Act of 1996, the predecessor to our current federal anti-dilution law, we generally held that for a dilution claim to lie, a defendant's mark had to be "identical or very or substantially similar" to plaintiff's famous mark.  *See e.g., Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1183 (TTAB 2001); *Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.,* 77 USPQ2d 1492 (TTAB 2005), *aff'd* 81 USPQ2d 1919 (Fed. Cir. 2007); *see also Citigroup Inc.,* 94 USPQ2d at 1667 ("for dilution to occur the marks must at least be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same").

This approach reasoned that because dilution is an extraordinary remedy, not only was dilution-level fame of

the opposer's mark required, but near identity of the marks. *Toro Co.,* 61 USPQ2d at 1174. This assessment was considered consistent with the examples that were cited in the legislative history of the Act, e.g., "Buick aspirin" and "Kodak piano," where the diluting mark was identical to the owner's famous mark. It also rested on the theory that dilution equates to a form of appropriation of the mark itself, not the use of a similar mark. *See, e.g., Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158, 1162, 97 USPQ2d 1947, 1952 (9th Cir. 2011); *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 49 USPQ2d 1225, 1242 (1st Cir. 1998)("[A]n entirely different issue is at stake— not interference with the source signaling function but rather protection from an appropriation of or free riding on the investment [the mark owner] has made in its [mark].").

With the passage of the Trademark Dilution Revision Act of 2006, Congress took a different approach. While the changes were made in direct response to the U.S. Supreme Court's 2003 decision in the *Victoria's Secret* case,[37] Congress chose not to merely amend the wording of that portion of the Act addressing "actual dilution," but also made substantial changes to the scope of the law. "The 2006

---

[37] *Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1, 65 USPQ2d 1801 (2003).

law for the first time defined dilution by blurring and created a multi-factor list of factors to determine blurring."  1 *J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition* § 5:11 (4th ed. 2011).  As explained by the Ninth Circuit Court of Appeals:

> Beginning with subsection (c)(1) of 15 U.S.C. § 1125, Congress provided that "the owner of a famous mark ... shall be entitled to an injunction against another person who ... commences use of *a* mark or trade name in commerce that is likely to cause dilution." 15 U.S.C. § 1125(c) (emphasis added).  When referring to the junior mark, Congress did not authorize an injunction against another person who commences use of "the" mark; use of the definite article "the" clearly would have signaled that the junior mark had to be the same as the senior.  Instead, Congress employed the indefinite article "a," which indicates that any number of unspecified, junior marks may be likely to dilute the senior mark.

> Turning to the language of subsection (c)(2)(B), the TDRA defines "dilution by blurring" as the "association arising from the *similarity* between a mark and a trade name and a famous mark that impairs the distinctiveness of the famous mark." *Id.* § 1125(c)(2)(B) (emphasis added). Congress did not require an association arising from the "substantial" similarity, "identity" or "near identity" of the two marks.  The word chosen by Congress, "similarity," sets forth a less demanding standard than that employed by many courts under the FTDA.

> This analysis of the language of the statute, and our comparison of this language with the now-repealed statute, are further supported by Congress's decision to employ, in subsection (c)(2)(B), a non-exhaustive list of relevant factors to determine when dilution has occurred. Congress's implementation of such a methodology is simply not compatible with a determination that

31

identity, near identity or substantial similarity are necessary to constitute a threshold showing for relief under § 1125(c).  Indeed, Congress chose instead to make the "degree of *similarity* between the mark or trade name and the famous mark," *id.* § 1125(c)(2)(B)(i) (emphasis added), to be the first of the six (or more) relevant factors to be considered.

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158, 1171, 97 USPQ2d 1947, 1958 (9th Cir. 2011); *see also, Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 92 USPQ2d 1769 (2d Cir. 2009); and *Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 111 n. 18, 94 USPQ2d 1188, 1201 n. 18 (2d Cir. 2010) ("We have recently explained that under the [TDRA] the similarity between the famous mark and the allegedly blurring mark need not be 'substantial' in order for the dilution by blurring claim to succeed.")

The harm dilution does to the selling power of a mark is not only caused by a third-party use or registration of an identical mark.  It may be caused by a "look-alike" mark, one that is close enough to the famous mark that consumers will recall the famous mark and be reminded of it, as this Board has explained, "even if they do not believe that the goods come from the famous mark's owner":

> "Dilution occurs when consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832, 50 USPQ2d 1047, 1051 (8th Cir. 1999).  Therefore,

> blurring occurs when a substantial percentage
> of consumers, upon seeing the junior party's
> use of a mark on its goods, are immediately
> reminded of the famous mark and associate the
> junior party's use with the owner of the
> famous mark, even if they do not believe that
> the goods come from the famous mark's owner.

*Toro Co.,* 61 USPQ2d at 1183; *see also Coach Services,* 96

USPQ2d at 1612-13.  The Board also noted in *National Pork*

*Board*, 96 USPQ2d at 1497, that:

> When making a determination under the
> Trademark Dilution Revision Act of 2005
> (TDRA), after finding in the affirmative on
> the question of pre-existing fame, an
> important question in a dilution case is
> whether the two involved marks are
> sufficiently similar to trigger consumers to
> conjure up a famous mark when confronted with
> the second mark.

With this background, we now turn to a consideration of

the degree of similarity between applicants' and opposer's

marks in the dilution context.  While we are not concerned

in this context with whether a likelihood of confusion

exists, we still consider the marks, not on the basis of a

side-by-side comparison, but rather in terms of whether the

marks are sufficiently similar in their overall commercial

impressions that the required association exists.  Also, in

determining the similarity or dissimilarity of the marks,

"we will use the same test as for determining the similarity

or dissimilarity of the marks in the likelihood of confusion

analysis, that is, the similarity or dissimilarity of the

marks in their entireties as to appearance, sound, connotation and commercial impression." *Coach Services,* 96 USPQ2d at 1613.

We have already found that the parties' marks are substantially similar such that when used on their respective goods, consumer confusion is likely. Taking into account the similarities of the marks, and the fame of opposer's mark, we find that applicants' mark JUST JESU IT is sufficiently similar to opposer's mark JUST DO IT to "trigger consumers to conjure up" opposer's famous mark. See *National Pork,* 96 USPQ2d at 1497. Upon encountering applicants' mark, consumers will be immediately reminded of opposer's JUST DO IT mark and associate applicants' mark with opposer's mark. This factor favors opposer.

E.  Any Actual Association Between The Parties' Marks

There is no actual association between the parties' marks, inasmuch as applicants have not yet used their mark in commerce. This dilution factor is neutral.

F.  Whether Applicants Intended to Create an Association with Opposer's Mark.

Applicants acknowledge that opposer's mark is famous, and that they were aware of opposer's mark before seeking

34

registration for their own.[38]  Nonetheless, there is no direct evidence that applicants intended to create an association with opposer's famous mark.  This factor is neutral "but consistent with a likelihood of dilution by blurring." *National Pork,* 96 USPQ2d at 1498.

G.  Other Relevant Factors

The TDRA provides for a consideration of "all relevant factors," including those specifically listed.  Three additional factors play a role in this case.

*1. Size of Applicants' Business*

Applicants depict themselves as a small company, contrast this with their characterization of opposer as a large, powerful company, and argue that applicants' use of their mark for "humorous, religious-themed apparel"[39] would not harm opposer.  There are two possible defenses being raised by applicants' arguments.  The first is that applicants are too small to cause any real harm to opposer. The second is that applicants' mark cannot impair the distinctiveness of opposer's mark because applicants' mark is merely a parody.  We first address the size of applicants' business argument.

---

[38] See applicants' response to opposer's interrogatory No. 13, *infra* at 6.
[39] *Applicants' Brief,* p. 15.

There is no evidence in the record that supports applicants' statement that they are "a very small company."[40] Even assuming the statement to be true, opposer has shown that its mark is the type of "famous and distinctive" mark that has already attracted multiple third parties attempting to play off opposer's mark.[41] Were opposer to make an exception to its policy not to allow third parties to use marks of the structure "just … it" for any reason, opposer's mark's ability to uniquely identify opposer as a single source and thus maintain its selling power would be impaired. *See National Pork*, 96 USPQ2d at 1497 ("Over time, the gradual whittling away of distinctiveness will cause the trademark holder to suffer 'death by a thousand cuts.'); *see also, 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition,* § 24:120 (4th ed. 2011)(discussing the issue of causation between defendant's mark and likely injury to the famous mark).

This defense does not assist applicants, and as a factor weighs in opposer's favor.

---

[40] *Id.,* p. 1.

[41] As noted *supra* at p. 26*,* opposer has shown that it denies all requests for permission to use the mark JUST DO IT without regard to the underlying purpose to which the request pertains, including requests for permission to use the mark in connection with religious activities. The record also shows that opposer has refused third-party requests to use variations of the mark, such as "Just Ski It," "Just Swim It," and "Just Ride It" (Schwartz Dep., p. 20) and "Just Live It" (Id., p. 21).

### 2. Parody Defense

Applicants also argue that their mark is intended to be "humorous." To be considered a parody for trademark dilution purposes, the mark must communicate "some articulable element of satire, ridicule, joking, or amusement" directed to the original mark. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog LLC,* 507 F. 3d 252, 84 USPQ2d 1969, 1973 (4th Cir. 2007) (CHEWY VUITON held to be non-infringing parody of LOUIS VUITTON). Here, applicants are not intending to use their mark to parody or to make any type of social commentary regarding opposer, opposer's famous mark or opposer's goods. Instead, they are seeking to use their mark for religious social commentary, and attempt to take a "free ride" on the mark's association with the famous mark for economic gain. This is not protectable parody.

This defense does not assist applicants, and as a factor weighs in opposer's favor.

### 3. Relatedness of the Goods

The dilution doctrine was designed to provide a remedy where the goods or services involved were neither competitive nor necessarily related. However, the TDRA did not preclude the application of the doctrine where goods are related or competing. "[C]ourts have observed that 'the

closer the products are to one another [in the marketplace], the greater the likelihood of both confusion and dilution.'" *Toro,* 61 USPQ2d at 1184, n. 20, quoting *Las Vegas Sports News,* 212 F.3d at 164, 54 USPQ2d at 1581, quoting, *Nabisco Brands*, 191 F.3d at 222, 51 USPQ2d at 1882.

Here, the parties' goods are in-part identical. This factor favors opposer.

*Balancing the Factors*

Having considered all of the evidence properly of record and all of the parties' arguments, we find that the balance of factors weighs in opposer's favor. The marks are sufficiently similar that an association between them is established. Opposer's mark is inherently distinctive and the degree of public recognition of the mark is extremely high. Opposer engages in substantially exclusive use of its mark, policing unauthorized uses of its mark and refusing permission to use it to all who ask. While there does not appear to be an actual association between the marks (nor could there be at present because applicants' mark is not yet in use), and the record does not reflect a bad faith intent on applicants' part in adopting the mark, these two factors do not outweigh the other dilution factors. There is no evidence of record to support applicants' "small company" argument; its parody defense is

inapposite, and the fact that the goods are in-part identical further weighs in favor of a finding of impairment.

Accordingly, we find that applicants' mark is likely to dilute opposer's mark under Trademark Act § 43(c)(2)(B), 15 U.S.C. § 1125(c)(2)(B). Opposer has shown on this record that its mark is famous, that it became famous prior to the filing date of applicants' application for their mark, and that an association exists between the parties' marks that would impair the distinctiveness of opposer's famous mark.

*Decision*: The opposition is sustained and registration to applicant is refused.